1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORMA DELGADO,<br>          **Plaintiff,**<br>      **v.**<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br>          **Defendant.**<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | NO. EDCV 16-1018-KS<br><br>**MEMORANDUM OPINION AND ORDER** |

## INTRODUCTION

Plaintiff filed a Complaint on May 17, 2016, seeking review of the denial of her applications for a period of disability and disability insurance benefits ("DIB"). (Dkt. No. 1.)  On October 20, 2016, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before the undersigned United States Magistrate Judge.  (Dkt. Nos. 12, 15, 30.)   On November 17, 2017, the parties filed a Joint Stipulation ("Joint Stip.") (Dkt. No. 29) in which plaintiff seeks an order reversing the Commissioner's decision and either ordering the payment of benefits or remanding the matter for further administrative proceedings (Joint Stip. at 60-61).  The Commissioner requests that the ALJ's decision be affirmed or

remanded for further proceedings. (*See id.* at 62.) The Court has taken the matter under submission without oral argument.

## SUMMARY OF ADMINISTRATIVE PROCEEDINGS

On May 2, 2011, Plaintiff, who was born on June 23, 1961, filed an application for DIB.[1] (*See* Joint Stip. at 2; Administrative Record ("AR") 31, 212.) Plaintiff alleged disability commencing June 3, 2009, due to: "severe back, neck, head, shoulders, lower back and leg pain." (AR 212, 247.) Plaintiff previously worked in the following occupations: production line leader (DOT 706.687-010); packager (DOT 920.587-018); plastic chair trimmer (DOT 690.482-014); receptionist (DOT 237.367-038); and laborer in the soap industry (DOT 550.585-018). (AR 45, 86-87, 256-62.) The Commissioner denied Plaintiff's application initially and on reconsideration. (AR 111, 127.) On July 23, 2013, Plaintiff requested a hearing. (AR 144.) On April 16, 2016, Administrative Law Judge Tamara Turner-Jones ("ALJ") held a hearing. (AR 52.) Plaintiff, who was represented by counsel and assisted by a Spanish language interpreter, and David Rinehart, the vocational expert ("VE"), testified at the hearing. (AR 53, 54, 56-97.) On September 24, 2014, the ALJ issued an unfavorable decision, denying Plaintiff's application for DIB. (AR 25-46.) On March 22, 2016, the Appeals Council denied Plaintiff's request for review. (AR 1-8.)

## SUMMARY OF ADMINISTRATIVE DECISION

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2014 and had not engaged in substantial gainful activity after the

---

[1]    Plaintiff was 47 years old on the alleged onset date and thus met the agency's definition of a younger person. *See* 20 C.F.R. § 404.1563(c). Plaintiff is now 56 years old and therefore meets the agency's definition of a person of advanced age. 20 C.F.R. § 404.1563(e).

2

alleged onset date of June 3, 2009. (AR 33.) The ALJ further found that Plaintiff had the following severe impairments: cervical myelopathy with radicular pain; lumbosacral strain; and arthritis, right knee. (AR 33.) The ALJ also found that Plaintiff had the medically determinable impairments of headaches, history of obesity, and adjustment disorder with depressed mood, but that these impairments were nonsevere. (AR 33-37.) The ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any impairments listed in 20 C.F.R. part 404, subpart P, appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526), including Listings 1.02 and 1.04. (AR 37.) The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work as follows:

> [plaintiff] can lift and/or carry 20 pounds occasionally and 10 pounds frequently; she can stand and/or walk for six hours out of an eight-hour workday; she can sit for six hours out of an eight-hour workday; she can occasionally kneel, stoop, crawl, and crouch; she can occasionally climb ramps and stairs; she can occasionally kneel, stoop, crawl, and crouch; she can occasionally climb ramps and stairs; she can never climb ladders, ropes, or scaffolds; she can frequently use her bilateral upper extremities for reaching in all directions except overhead; she can reach overhead (above shoulder level) occasionally; she can frequently perform fine and gross manipulations with the upper extremities; she can frequently rotate her neck from side-to-side; she can keep her head in a fixed position for 20 minutes at one time; she must avoid exposure to hazards such as unprotected heights and dangerous moving machinery; she must avoid concentrated exposure to extremely cold temperature; she can occasionally perform repetitive pushing and/or pulling within the weight restrictions noted above for lifting and/or carrying; she can remember, understand, and carryout both detailed and complex instructions; she can interact and respond appropriately to coworkers, supervisors, and the

general public; and she would be off-task for five percent of the workday because of pain.

(AR 37.)

The ALJ determined that Plaintiff was able to perform her past relevant work as a production line leader (DOT 706.687-010), plastic chair trimmer (DOT 690.482-014), receptionist (DOT 237.367-038), and laborer in the soap industry (DOT 550.585-018). (AR 45.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from the alleged onset through the date of the ALJ's decision. (*Id.* 45-46.)

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence in the record as a whole. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 522-23 (9th Cir. 2014) (internal citations omitted). "Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).

Although this Court cannot substitute its discretion for the Commissioner's, the Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal quotation marks and citation omitted);

*Desrosiers v. Sec'y of Health and Hum. Servs.*, 846 F.2d 573, 576 (9th Cir. 1988).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

The Court will uphold the Commissioner's decision when the evidence is susceptible to more than one rational interpretation.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  However, the Court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely." *Orn*, 495 F.3d at 630; *see also Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).  The Court will not reverse the Commissioner's decision if it is based on harmless error, which exists if the error is "'inconsequential to the ultimate nondisability determination,' or if despite the legal error, 'the agency's path may reasonably be discerned.'" *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (internal citations omitted).

## DISCUSSION

## I.    <u>Issues Presented</u>

Plaintiff alleges the following errors:  (1) the ALJ erred in failing to find that Plaintiff's impairments meet or equal the requirements for Listings 1.02 and 1.04 (Joint Stip. at 10-20); (2) the ALJ did not properly consider the opinions of several of Plaintiff's treating and examining medical sources, including Drs. Fred Hafezi, Arnoldo Aleman, and Stepan Kasimian (Joint Stip. at 30-32); and (3) the ALJ did not properly evaluate the credibility of Plaintiff's statements about the symptoms and limiting effects of her impairments (Joint Stip. at 39-44).  Plaintiff concludes that, because of these three errors, the ALJ did not present a complete hypothetical to the VE and inadequately supported her determination that Plaintiff can perform her past relevant work.  (*See* Joint Stip. at 55-57, 59.)

After reviewing the more than 2,000 page Administrative Record, the Court agrees with Plaintiff that the ALJ erred in her evaluation of the findings and opinions of several of Plaintiff's treating and examining medical sources – namely, Drs. Hafezi, Aleman, and Kasimian – with regards to both her finding that Plaintiff's impairments did not meet or equal the requirements for Listings 1.02 and 1.04 and her assessment of Plaintiff's residual functional capacity. Accordingly, the Court remands for further proceedings on this basis and declines to reach the other issues in dispute. However, on remand, the ALJ is reminded to articulate specific, clear, and convincing reasons supported by substantial evidence in the record for finding Plaintiff's statements regarding the severity of her symptoms less than fully credible if Plaintiff has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce those symptoms and the ALJ has not determined that she is malingering.

## II.    Background And Contentions

At step three of the sequential analysis, an ALJ must consider whether a claimant's condition meets or equals any of the listed impairments under Social Security regulations. If a claimant has a severe impairment or combination of impairments that meets or equals one of the listings, disability is conclusively presumed and benefits are awarded. "To *meet* a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her claim. To *equal* a listed impairment, a claimant must establish symptoms, signs, and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment . . . ." *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999) (quoting 20 C.F.R. § 404.1526) (emphases in original). The burden is on the claimant to produce evidence that her impairments meet or equal a listing. *Bowen v. Yuckert*, 482 U.S. 137, 145-52 (1987). If the ALJ finds that the claimant's condition does not meet or equal any of the listed impairments, then, before moving to step four of the sequential evaluation process, the ALJ must determine the claimant's residual functional

capacity – that is, her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.  20 C.F.R. §§ 404.1520(e), 404.1545.

The ALJ stated that she considered Plaintiff's impairments, singly and in combination, under Listings 1.02 and 1.04, but found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of either Listing. (AR 37.)  The ALJ explained that, for the reasons stated in connection with her RFC determination, she found that "no treating or examining physician had recorded objective clinical or diagnostic findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show objective clinical or diagnostic findings that are the same or equivalent to those of any listed impairment."  (AR 37.)  The ALJ further determined, as stated above, that Plaintiff retained the residual functional capacity to perform light work as follows:  lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for six hours out of an eight-hour workday; sit for six hours out of an eight-hour workday; occasionally kneel, stoop, crawl, and crouch; occasionally climb ramps and stairs; occasionally kneel, stoop, crawl, and crouch; occasionally climb ramps and stairs; frequently use her bilateral upper extremities for reach in all directions except overhead; and, *inter alia*, reach overhead (above shoulder level) occasionally.  (AR 37.)

Plaintiff contends that a thorough analysis of the medical evidence would show that Plaintiff's back impairments "meet or equal both Listing 1.04 – either 1.04A[2] or 1.04C[3] –

---

[2]     Under Listing 1.04A, a person is disabled if she has a disorder of the spine resulting in compromise of a nerve root or spinal cord with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).
[3]     Under Listing 1.04C, a person is disabled if she has a disorder of the spine resulting in compromise of a nerve root or spinal cord with lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

7

and Listing 1.02[4] (Joint Stip. at 10, 18) and the ALJ failed to adequately support her findings that Plaintiff's impairments do not meet a listing (Joint Stip. at 18) (citing *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001)). Plaintiff specifically points to medical evidence from Drs. Hafezi, Aleman, Kasimian, and Shah (Joint Stip. at 11-17) and contends that the ALJ's reasons for assigning little weight to the opinions of Drs. Hafezi, Aleman, and Kasimian are legally insufficient and not supported by substantial evidence in the record (Joint Stip. at 31-32).

## III.   **Applicable Law**

"The ALJ is responsible for translating and incorporating clinical findings into a succinct RFC." *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015). In doing so, the ALJ must articulate a "substantive basis" for rejecting a medical opinion or crediting one medical opinion over another. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); *see also Marsh v. Colvin*, 792 F.3d 1170, 1172-73 (9th Cir. 2015) ("an ALJ cannot in its decision totally ignore a treating doctor and his or her notes, without even mentioning them").

The opinion of a treating source is generally entitled to greater weight than the opinion of doctors who do not treat the claimant because treating sources are "most able to provide a detailed, longitudinal picture" of a claimant's medical impairments and bring a perspective to the medical evidence that cannot be obtained from objective medical findings alone. *See Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); *see also* 20 C.F.R. § 404.1527(c)(2). To reject an uncontradicted opinion of a treating or examining physician, the ALJ must provide "clear and convincing reasons that are supported by substantial evidence." *Trevizo*

---

[4]     Under Listing 1.02, a person is disabled if she has a major dysfunction of a joint characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and, *inter alia*, chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).

*v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017); *Ghanim v. Colvin*, 763 F.3d 1154, 1160-61 (9th Cir. 2014). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Trevizo*, 871 F.3d at 675. "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id.* (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

If, however, the medical professional at issue is not an "acceptable medical source" under the regulations, the ALJ is held to a less stringent standard. *See* 20 C.F.R. § 404.1502 (defining the term "acceptable medical source"), 20 C.F.R. § 404.1527(a)(2) (defining "treating source" as the "acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]"). Specifically, the opinions of a non-acceptable medical source, such as a chiropractor, are entitled only to the weight warranted by the facts of the case, 20 C.F.R. § 404.1527(f)(1), and the ALJ may discount his opinions after articulating "germane" reasons for doing so. *See Britton v. Colvin*, 787 F.3d 1011, 1013 (9th Cir. 2015).

## IV.  ALJ's Evaluation Of Dr. Hafezi's Opinion

### A. Dr. Hafezi's Opinions And Treatment Records

Plaintiff relies heavily on the opinions of Dr. Fred F. Hafezi, M.D., a diplomate of the American Board of Orthopedic Surgery, stating that his reports show that Plaintiff satisfies "all the listing requirements for 1.04." (Joint Stip. at 25-27.) On August 3, 2009, Dr. Hafezi executed an initial consultation, evaluation, and treatment plan report in connection with Plaintiff's workers' compensation claim. (AR 441-46.) Dr. Hafezi reported that, on or

about May 8, 2009, Plaintiff was working at the assembly line, packaging nutritional pills and products, when she saw one of the bottles fall and spill products on the floor. (AR 441-42.) She ran to turn the machine off but slipped and fell, hitting the ground with her right hip and the right side of her head. (AR 442.) Plaintiff required assistance to get back on her feet. (AR 442.) She experienced pain in her back, right hip, and right side of the neck and head, which peripheralized to her right upper extremity and both lower extremities. (AR 442.) She was sent to a company doctor where x-rays were taken and she was given 800 mg of Motrin. (AR 442.) She tried to return to work a few days after the injury but could not withstand the pain. (AR 442.) She was then put on Total Temporary Disability status. (AR 442.) She presented to Dr. Hafezi with, *inter alia*, neck pain, radiating to her right upper extremity, pain in her low back, and headaches. (AR 442.) A cervical compression test was negative. (AR 443.) Dr. Hafezi measured Plaintiff's range of motion in her lumbar spine as follows: forward flexion, 35 degrees; hyperextension, 10 degrees; and, *inter alia*, lateral flexion, right 15 degrees, and left, 30 degrees. (AR 444.) Straight leg raising test was positive on the right at 60 degrees. (AR 444.) The Bragard test and Bowstring test were also right positive. (AR 444.) Dr. Hafezi diagnosed Plaintiff with piriformis syndrome, right hip, and postconcussion syndrome. (AR 444.) He taught Plaintiff several exercises, recommended chiropractic care and physical therapy, and prescribed Soma, Darvocet, Motrin, Zantac, vitamin B1, and Gabapentin. (AR 445.) Dr. Hafezi also recommended a lumbar epidural block and right piriformis block and ordered additional diagnostic imaging, including x-rays and MRIs. (AR 445.) Dr. Hafezi placed Plaintiff on 17 weeks of Total Temporary Disability status. (AR 446.)

On August 21, 2009, Dr. Hafezi executed an updated "re-evaluation and treatment plan progress report." (AR 435.) Dr. Hafezi reviewed a series of diagnostic studies. An MRI of the lumbar spine showed a "huge 7-mm extruded L5-S1" and 6-mm L4-L5 disc, an annular tear at the L5-S1 level, and spinal stenosis at the L5-S1 level. (AR 436.) Dr. Hafezi measured Plaintiff's range of motion in her lumbar spine as follows: forward flexion, 45

degrees; and hyperextension, 25 degrees. (AR 436.) Straight leg raising and lumbar foraminal closure tests were negative. (AR 436.) Dr. Hafezi recommended a right piriformis block under fluoroscopy and additional diagnostic studies as well as physical therapy and acupuncture. (AR 437.) He increased Plaintiff's Gabapentin dosage and prescribed Imitrex for her headaches. (AR 437.) Dr. Hafezi also requested authorization from Plaintiff's employer to perform decompression, laminectomy, and neural foraminotomy for her L5-S1 disc. (AR 438.)

Dr. Hafezi subsequently performed a lumbar epidurogram under fluoroscopy guidance, a lumbar epidural block, epidural guidance, and a right piriformis block, intertrochanteric fossa, hip under fluoroscopy guidance. (AR 439.)

On September 23, 2009, Dr. Hafezi executed an updated "re-evaluation and treatment plan progress report." (AR 432.) Plaintiff's cervical compression test was negative. (AR 432.) Dr. Hafezi measured Plaintiff's range of motion in her lumbar spine as follows: forward flexion, 45 degrees; and hyperextension, 10 degrees, inhibited by pain across the low back. (AR 432.) Straight leg raising was positive (AR 432) as was the positive foraminal closure test, bilaterally for radiating pain to mid-thighs (AR 433). Dr. Hafezi observed that Plaintiff was unable to squat or even semi-squat, could tolerate upright posture for no more than 20 minutes, had no tolerance to sudden impact, running, or jumping, and was limited in her daily activities but exhibited a normal gait. (AR 433.) Dr. Hafezi opined that Plaintiff was a surgical candidate for hemilaminectomy and discectomy of the right L4-L5 and L5-S1 for a 6mm and 7mm herniated and extruded disc respectively and requested authorization to proceed with this surgery as well as with a right neural foraminotomy and partial facetectomy. (AR 433.) Dr. Hafezi ordered Vicoden 7.5 mg and renewed Plaintiff's prescriptions for Soma and Gabapentin. (AR 433.) He also ordered Plaintiff to continue with chiropractic care, home motorized traction, ultrasound, diathermy, and electrical

stimulation. (AR 433.) He noted that Plaintiff was developing "sciatic claudication and spinal stenosis syndrome, right leg." (AR 434.)

On November 4, 2009, Dr. Hafezi executed an updated "re-evaluation and treatment plan progress report." (AR 428.) He requested authorization for a lumbar epidural facet block, but stated that Plaintiff "eventually will need the right hemilaminectomy and discectomy at L4-L5 and L5-S1 and neural foraminotomy." (AR 428.) Under "Review of Pertinent Diagnostic Tests," Dr. Hafezi wrote that Plaintiff "has a 6-mm huge herniated L4-L5 and a 7-mm extruded and protruded L5-S1 disc with annular tear on MRIs of July 7, 2009 . . . complicated by lateral recess stenosis results in sciatic claudication." (AR 428.) However, he also observed that Plaintiff is "ambulatory with her normal gait." (AR 429.) The Trendelenburg test was negative. (AR 429.) Dr. Hafezi measured Plaintiff's range of motion in her lumbar spine as follows: forward flexion "splinted beyond 30 degrees of forwarded flexion by reflex spasm in the paralumbar muscles;" hyperextension "inhibited beyond 5 degrees;" lateral flexion, 10 degrees on both sides; and rotation, right, 20 degrees and left, 40 degrees, showing pain at range of motion in all directions. (AR 429.) Dr. Hafezi stated that Plaintiff's right piriformis syndrome was "resolved," "cured by the piriformis block." (AR 430.) He diagnosed her with persistent right lumbar radiculopathy, right 5 and 6 mm L4-L5 disc herniation, and 4mm C4-C5 disc herniation. (AR 430.) Dr. Hafezi opined that, because of "the entrapment of the sciatic nerve roots to the right lower extremity by herniated fourth and fifth lumbar disc of huge degree," it was unlikely that Plaintiff could ever return to working as a packer. (AR 430.) Dr. Hafezi stated that Plaintiff is a candidate for surgery and should return in six weeks for evaluation. (AR 430.) In the meantime, he ordered a home cervical traction apparatus, cervical roll pillow, rigid lumbosacral brace, and a hot and cold VitalWrap. (AR 430.)

On December 22, 2009, Dr. Hafezi executed an updated "re-evaluation and treatment plan progress report." (AR 425.) Plaintiff had a positive cervical compression test. (AR

425.)  Dr. Hafezi measured Plaintiff's range of motion in her lumbar spine as follows: forward flexion "splinted beyond 15 degrees;" hyperextension, 5 degrees; and lateral flexion, 10 degrees on both sides.  (AR 425-26.)  The straight leg raising test was positive on the right at 40 degrees and on the left at 20 degrees.  (AR 426.)  Right Trendelenburg test was also positive.  (AR 426.)  Dr. Hafezi diagnosed Plaintiff with a 4mm C5-C6 disc herniation, 3 mm C4-C5 disc herniation; piriformis syndrome, right hip; postconcussion syndrome; and, *inter alia*, a 6-mm and 7-mm herniated disc at L4-L5 and L5-S1.  (AR 426.)  He noted that conservative therapy had not relieved Plaintiff's back and leg pain.  (AR 426.)  He requested authorization for the following surgery:  "lumbar two-level laminectomy, right hemilaminectomy, discectomy, neural foraminotomy, partial facetectomy, and relief of lumbar nerve roots entrapment."  (AR 426.)  He also ordered "Vicodin, back brace, neck brace, and neck traction for home use."  (AR 426.)

On January 28, 2010, Dr. Hafezi executed an updated "re-evaluation, treatment plan progress report, and request for surgical treatment."  (AR 422.)  Dr. Hafezi wrote that, "following an epidural block of the lumbar spine for a 6-mm herniated L4-L5, 7-mm L5-S1 disc and right piriformis block for piriformis syndrome," Plaintiff's pain had returned and is worsening.  (AR 422.)  "[Plaintiff] presents with sciatic claudication with rest pain symptoms after three blocks."  (AR 422.)  Nevertheless, Dr. Hafezi observed that Plaintiff walked with a normal gait.  (AR 422.)  Plaintiff's straight leg raising test was positive at 40 degrees bilaterally.  (AR 422.)  Dr. Hafezi measured Plaintiff's range of lumbosacral spine motion as follows:  her forward flexion was "50 degrees, splinted;" her hyperextension was "5 degrees, intimidated by pain;" and, *inter alia*, her lateral flexion was 20 degrees on both sides.  (AR 422.)  Dr. Hafezi observed weakness in Plaintiff's peroneal muscle supplied by L5 nerve roots, causing Plaintiff's feet to invert on heel while walking.  (AR 423.)  He also observed that Plaintiff's sacrospinous muscles were swollen to palpation all the way up to the base of her neck.  (AR 423.)  The Trendelenburg test was negative.  (AR 423.)  Dr. Hafezi diagnosed Plaintiff with "ascending physiological malalignment of the spine,

posttraumatic industrially related, secondary to huge herniated L5-S1 and L4-5 disc with combined spinal stenosis" and wrote that the malalignment of Plaintiff's spine had "occurred all the way up like a sausage tube of edema throughout the sacrospinous muscle causing neck pain, stiffness, and radiating pain down the upper extremities." (AR 423.) He continued Plaintiff's Total Temporary Disability status and recommended that Plaintiff receive "decompression, hemilaminectomy, discectomy, neuroformainotomy, and partial facetectomy at L4-L5 and L5-S1." (AR 423.) He noted that Plaintiff continues to require multiple narcotic analgesics daily and that a back brace had not relieved her pain. (AR 423.) He also recommended acupuncture, chiropractic care, and physical therapy to diminish the need for narcotics. (AR 423.) He also recommended that Plaintiff lose some weight. (AR 424.)

On March 26, 2010, Dr. Hafezi executed an updated "re-evaluation and treatment plan progress report." (AR 420-21.) Dr. Hafezi diagnosed Plaintiff with 7mm L5-S1 and 6mm L4-L5 disc herniation (AR 421) and observed that, although Plaintiff's standing posture was normal, her forward flexion was splinted at 15 degrees and listing to the left (AR 420). Dr. Hafezi noted that he had previously requested authorization to perform a right hemilaminectomy at L4-L5 and L5-S1 but Plaintiff's employer had not responded to his request. (AR 420.) In light of the employer's silence and the California Workers' Compensation Appeals Board decision in *Cervantes v. El Aguila Food Prods.*, 3 Cal. WCC 1258 (Cal. W.C.A.B. Nov. 19, 2009), Dr. Hafezi referred Plaintiff to Brotman Memorial Hospital for preoperative preparation. (AR 420.) Plaintiff remained on extended Total Temporary Disability status and Dr. Hafezi prescribed Oxycontin 20 mg and Ambien 10 mg. (AR 420.)

On May 10, 2010, Dr. Hafezi executed a letter to a representative of Plaintiff's employer stating that he had reevaluated Plaintiff and had requested a second opinion concerning Plaintiff's cervical spine and lumbar spine but had not received a response from

Plaintiff's employer. (AR 417.) Dr. Hafezi noted that Plaintiff had a 6-mm herniated L4-5 disc and 7-mm L5-S1 disc and her chronic neck and back conditions were deteriorating. (AR 417.) He stated that the cervical compression test is positive for midline pain radiating to both shoulder girdles. (AR 418.) Plaintiff exhibited a limited range of motion of the spine: her forward flexion was "splinted beyond 15 degrees by reflex spasm in the paralumbar muscles and flattening the curvature of low back"; her hyperextension was "painfully inhibited beyond 10 degrees"; and, *inter alia*, her lateral flexion was "limited to either side beyond 20." (AR 418.) Plaintiff had a positive straight leg-raising test. (AR 418.) Dr. Hafezi wrote "patient screams with pain on attempted straight leg raising test." (AR 418.) The Trendelenburg sign was bilaterally positive showing weakness of her hip abductors supplied by the L5 nerve root. (AR 418.) Dr. Hafezi extended Plaintiff's Total Temporary Disability status. (AR 418.) He also switched Plaintiff's medication for her headaches, noting that her headaches were not responding to Vicodin. (AR 418.) Plaintiff's medications then included Imitrex 20 mg as needed, Vicodin 750 mg twice a day, and Oxycontin 20 mg twice a day. (AR 418-19.) Dr. Hafezi ordered Plaintiff to continue chiropractic care with Dr. Aleman to lessen her need for narcotic analgesics. (AR 419.)

### B. ALJ's Findings

The ALJ characterized Dr. Hafezi's findings and opinions as "essentially conclud[ing] that [Plaintiff] was temporarily disabled" (AR 43-44) and assigned them little weight because they were inconsistent with "substantial evidence," namely with: "reports stating that there was 'no justification for Plaintiff being taken off work'" (citing AR 1877 (July 7, 2009 medical records review by Steven W. Donner, D.O., describing a June 2, 2009 note from Alexander Carli, M.D., board certified surgeon in general surgery, plastic surgery, and hand surgery)); the July 14, 2011 observations of the examining orthopedic surgeon, Bunsri T. Sophon, M.D., diplomate of the American Board of Orthopedic Surgeons, who did not review any of Plaintiff's medical records (citing AR 826-31); the July 8, 2009 negative CT

scan of Plaintiff's head (citing AR 416); and the normal findings from x-ray scans of Plaintiff's lumbar and cervical spine (citing AR 1570 (record for an individual who is not Plaintiff but rather a "John Doe" born on January 20, 1976) and AR 1592 (September 10, 2010 initial evaluation of Plaintiff by Edwin Haronian, M.D., certified diplomate of American Board of Orthopedic Surgery, describing "relatively normal" x-rays of Plaintiff's cervical spine and describing x-rays of Plaintiff's lumbar spine as revealing mild scoliosis – possibly due to paravertebral muscle spasm – and decreased disc height at L4-L5 level with no evidence of fractures, dislocations, spondylolisthesis, or spondylolysis)). (AR 43-44.)

## C. Analysis

The ALJ's reasons for discounting the opinions of Dr. Hafezi are not specific and legitimate and supported by substantial evidence in the record. The June 2, 2009 note from Dr. Carli that is discussed in Dr. Donner's July 7, 2009 medical records review predates the July 7, 2009 and October 7, 2010 MRIs, which showed, *inter alia*, a 5-6mm posterior disc protrusion at the L4-L5 disc level with disc dessication and moderate hypertrophic facet changes as well as a 5-7 mm posterior disc protrusion at the L5-S1 disc level with disc dessication present, spondylosis present, increased signal consistent with an annular tear, hypopertrophic facet changes, and lateral recess stenosis present bilaterally (AR 487, 456-58). Similarly, the observations and opinions of the examining physician, Dr. Sophon, were made without *any* review of Plaintiff's extensive medical records, including the July 2009 and October 2010 MRIs and Dr. Hafezi's extensive treatment notes. (*See* AR 826 (stating that no medical records were available for review.)) *See also Vargas v. Berryhill*, No. EDCV-16-01027-KES, 2017 WL 968999, at *4 (C.D. Cal. Mar. 13, 2017) ("If an examining physician did not review all of the plaintiff's treatment records, this may be a reason for giving greater weight to the opinion of a treating physician who is more familiar with the longitudinal treatment record."); *Jackson v. Astrue*, No. CIV S–10–2401 EFB (TEMP), 2012 WL 639304, at *4 (E.D. Cal. Feb. 24, 2012) (ALJ "erred in rejecting the opinion of

plaintiff's treating physician in favor of an examining physician's opinion who did not review the entirety of plaintiff's medical records").

Further, the ALJ's characterization of portions of Dr. Sophon's observations as inconsistent with Dr. Hafezi's observations and conclusions is not supported by the record. For example, the ALJ notes that Dr. Sophon observed that Plaintiff was ambulatory with a normal gait (AR 44) but Dr. Hafezi made the same observation on more than one occasion (*see, e.g.*, AR 422, 429). Similarly, the ALJ cites Dr. Sophon's finding that Plaintiff exhibited a normal range of motion in her shoulders (AR 44), but Dr. Hafezi made the same observation (AR 425). Finally, the ALJ cites Dr. Sophon's finding that Plaintiff exhibited a normal range of motion in her hips (AR 44), but this observation appears to be consistent with Dr. Hafezi's determination that Plaintiff's piriformis syndrome was resolved as of November 4, 2009 and his decision not to measure her range of motion in her hips at subsequent examinations (*see generally* AR 417-31). Accordingly, Dr. Sophon's observations cited by the ALJ are not specific and legitimate reasons supported by substantial evidence for discounting Dr. Hafezi's opinions and conclusions.

The ALJ also supports her decision to discount Dr. Hafezi's opinions and conclusions with cites to a medical record that concerns an individual other than Plaintiff (AR 44 (citing AR 1570), a July 8, 2009 negative CT scan of Plaintiff's head (AR 44 (citing AR 416)), and Dr. Haronian's September 10, 2010 discussion of Plaintiff's x-rays (AR 44 (citing 1592)). Obviously, another patient's treatment records provide no support for the ALJ's assessment of Dr. Hafezi's opinions regarding Plaintiff. It is also unclear how the July 8, 2009 negative CT scan of Plaintiff's head conflicts with Dr. Hafezi's reports – and the ALJ does not explain her assertion that the two are inconsistent. (*See generally* AR 44.) Finally, although Dr. Haronian suggested in the September 10, 2010 report cited by the ALJ that the x-rays of Plaintiff's back indicated no serious bone abnormalities, Dr. Haronian did not have the opportunity to review, much less discuss, Plaintiff's 2009 and 2010 MRIs (*see* AR 1593

(stating that he was unable to review any of Plaintiff's diagnostic studies)) and his physical examination of Plaintiff, which revealed spasm, tenderness, and guarding in the paravertebral muscles of the cervical and lumbar spine along with decreased range of motion, is at least generally consistent with Dr. Hafezi's observations (AR 1593).

In light of the foregoing, the ALJ failed to provide specific and legitimate reasons supported by substantial evidence for discounting Dr. Hafezi's opinions and conclusions. This is not a determination that the ALJ should necessarily credit Dr. Hafezi's opinions and conclusions on remand, only that the ALJ needs to evaluate the record more closely and, if she elects to again discount Dr. Hafezi's findings, she must articulate specific and legitimate reasons supported by substantial evidence for doing so.

## V.      ALJ's Evaluation Of Dr. Aleman's Opinion

### A. Dr. Aleman's Opinions And Treatment Records

Dr. Arnaldo Aleman, D.C., is a chiropractor and Qualified Medical Evaluator – that is, a doctor certified by the State of California to examine injured workers in connection with their Workers' Compensation claims and write medical-legal reports. (*See* AR 1360.) Plaintiff began seeing Dr. Aleman as her primary treating physician in connection with her workers' compensation claim on June 18, 2009. (AR 1803.) Dr. Aleman observed subluxations and severe tenderness at multiple regions in the spine: the occipital region; the cervical region; the thoracic region; the lumbar region; and the sacral region. (AR 1803.) He also observed that Plaintiff's joint mobility was "fixed" in the occipital, cervical, lumbar, and sacral regions. (AR 1803.) In his treating notes, Dr. Aleman noted that Plaintiff complained of constant pain in the right hip joint, pain and intermittent pins and needles in both legs, constant pain in the right region of the neck, pain in the right shoulder joint with pins and needles in the right arm, constant sharp headaches, and sleep disturbance due to

pain. (AR 1804.) Dr. Aleman requested authorization for the following: an orthopedic consultation by Dr. Hafezi; trial acupuncture treatments; a Home TENS unit for relief of pain; and, *inter alia*, a work conditioning exercise regimen following an initial course of physiotherapy. (AR 1805.)

Approximately two months later, Plaintiff saw Dr. Aleman for a second time. Dr. Aleman listed her diagnoses as the following: head contusion; headache; sleep disturbance; cervical sprain/strain; shoulder contusion; lumbar sprain/strain; and radiculitis. (AR 1799.) Dr. Aleman noted that "per MRI study dated 7/7/09 there is a 7mm posterior disc protrusion at L5-S1 with an annular tear and DI." (AR 1799.) In the accompanying treating notes, Dr. Aleman observed that Plaintiff complained of frequent pain in the right hip joint, pain and intermittent pins and needles in both legs, frequent pain in the right region of the neck, pain in the right shoulder joint with pins and needles in the right arm, frequent sharp headaches, and sleep disturbance due to pain. (AR 1801.) In his objective findings, Dr. Aleman noted disc protrusions at C3-4, C4-5, C5-6, and C6-7. (AR 1801.) He observed subluxations at multiple regions in the spine: the occipital region; the cervical region; the thoracic region; the lumbar region; and the sacral region. (AR 1801.) Dr. Aleman also observed moderate muscle tenderness and mild to moderate spasms in several muscles. (AR 1801.)

On August 17, 2009, Dr. Aleman examined Plaintiff for a third time in connection with her workers' compensation claim and again listed her diagnoses as: head contusion; headache; sleep disturbance; cervical sprain/strain; shoulder contusion; lumbar sprain/strain; and radiculitis. (AR 1788.) Dr. Aleman again noted that "per MRI study dated 7/7/09 there is a 7mm posterior disc protrusion at L5-S1 with an annular tear and DI." (AR 1788.) Based on the MRI results, Dr. Aleman requested a referral to Dr. Stepan Kasimian for a surgical consultation. (AR 1789.) In his treating notes, Dr. Aleman observed that Plaintiff complained of pain and intermittent pins and needles in both legs, frequent pain in the right region of the neck, pain in the right shoulder joint with pins and needles in the right arm,

intermittent sharp headaches, and sleep disturbance due to pain. (AR 1790.) In his objective findings, Dr. Aleman noted "herniation present (lateral recess stenosis is present) at L4-5 there is a 6mm posterior disc protrusion present." (AR 1790.) He observed subluxations at multiple regions in the spine: the occipital region; the cervical region; the thoracic region; the lumbar region; and the sacral region. (AR 1790.) Dr. Aleman also observed moderate muscle tenderness and mild to moderate spasms in several muscles. (AR 1790.) On August 26, 2009, Dr. Aleman certified that Plaintiff "is unable to perform her regular work duties without exacerbating her condition" and noted that she had "herniated discs throughout the lumbar spine." (AR 1843.)

The record reflects that Dr. Aleman continued to treat Plaintiff for her back conditions for two or three years, as certified by the insurance company managing Plaintiff's workers' compensation claim, during which time Plaintiff's diagnoses and symptoms remained largely static. (*See, e.g.,* AR 1796-97 (September 28, 2009), AR 1792-93 (November 2, 2009), AR 1785-87 (February 24, 2010), AR 1781-83 (June 2, 2010), AR 1775-77 (September 1, 2010), AR 1778-79 (October 27, 2010), AR 1360-61 (October 26, 2011); *see also* AR 1738-39 (reflecting treatment, but no treating notes, for November 10, 2010, December 1, 2010, and July 11, 2011).)

Periodically during that treatment period, Dr. Aleman provided additional insight into Plaintiff's treatment and condition. For example, on November 3, 2009, Dr. Aleman completed a report and authorization request in which he observed that Plaintiff was now in "a chronic state of pain as defined by ACOEM guidelines" but "continues to improve" with Dr. Aleman's treatment protocol, which allows her to minimize the use of prescribed medication and perform activities of daily living with minimal effort. (AR 1794.) Dr. Aleman stated that he had reviewed Dr. Kasimian's orthopedic consultation report dated September 8, 2009 and agreed with his recommendation for anterior cervical discectomy and fusion at C5-6 with spinal cord decompression and L4-5 and L5-S1 decompression and

fusion due to spondylosis, intractable posterior neck and low back pain, intractable leg pain, and failure of conservative treatment.  (AR 1794.)  He wrote "[Plaintiff] has had extensive conservative treatment and epidural steroid injections which have only provided temporary relief."  (AR 1794.)  Similarly, on February 24, 2010, Dr. Aleman requested a referral for a surgical consultation due to the worsening of her low back condition, lack of improvement with the present treatment protocol, and the findings of the 7/7/09 MRI.  (AR 1786.)

On May 13, 2011, Dr. Aleman completed a form questionnaire entitled "Musculoskeletal" in which he stated that Plaintiff had a lumbar sprain with swelling, tenderness, and paraveterbral spasms around her "L/SP" joint.  (AR 466.)  He stated that Plaintiff's straight leg raise was positive in both the sitting and supine positions.  (AR 466.)  He stated that Plaintiff had "multiple disc herniation" and her response to treatment had been "minimal."  (AR 467.)  He stated that her prognosis was "poor" and the anticipated duration of her symptoms was "permanent."  (AR 468.)

Finally, on October 31, 2011, Dr. Aleman completed a form questionnaire entitled "Physical Capacities Evaluation" on which he indicated the following:  Plaintiff can sit, stand, or walk for 10 minutes at a time and for no more than 30 minutes total in an eight-hour workday; Plaintiff can lift and/or carry up to 10 pounds occasionally, 20 pounds rarely, and never more than 20 pounds; Plaintiff cannot do pushing and pulling or overhead use of her hands; Plaintiff can frequently reach, rarely bend, and never squat, crawl, or climb; and, *inter alia*, Plaintiff is totally restricted from activities involving unprotected heights and driving automotive equipment.  (AR 840.)  Dr. Aleman further opined that "the likelihood that the claimant will return to the workforce" was "never."  (AR 841.)  When asked for additional remarks, Dr. Aleman referred to "page enclosed."  (AR 841.)  It is unclear if he is referring to his treating notes for the October 26, 2011 visit (AR 1360-61) or another document.  (*See* AR 840-43.)

**B. ALJ's Findings**

The ALJ assigned little weight to Dr. Aleman's opinion because "it is brief, conclusory, and inadequately supported by clinical findings." (AR 43.) The ALJ noted that an opinion that is not from an acceptable medical source is not entitled to be given the same weight as a qualifying medical source opinion. (AR 43.) Additionally, the ALJ determined that Dr. Aleman's opinions were inconsistent with the negative scan of Plaintiff's head, contradicted by the normal findings from x-ray scans of Plaintiff's lumbar and cervical spine, and inconsistent with Plaintiff's description of her ability to perform several activities of daily living normally. (AR 43.) In particular, the ALJ noted that Plaintiff had: reported to the psychiatric consultative examiner that she got along well with others, shopped, cooked, cleaned, paid bills, and performed self-care tasks (AR 39 (citing AR 835)); and testified at the hearing that she was able to read the Bible, drive short distances, watch television, attend church, go out to eat, and prepare simple meals with some difficulties. (AR 39.)

**C. Analysis**

As a chiropractor, Dr. Aleman is not an "acceptable medical source" as that term is defined by the agency, and therefore, he does not qualify as a "treating source." *See* 20 C.F.R. § 404.1502 (defining the term "acceptable medical source"), 20 C.F.R. § 404.1527(a)(2) (defining "treating source" as the "acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]"). Accordingly, Dr. Aleman's opinions are entitled only to the weight that is warranted by the facts of the case, 20 C.F.R. § 404.1527(f)(1), and the ALJ was permitted to discount Dr. Aleman's opinions after articulating "germane" reason supported by substantial evidence for doing so. *See Britton*, 787 F.3d at 1013; *Murray v. Comm'r Soc. Sec. Admin.*, 226 F. Supp. 3d 1122, 1139

(D. Or. 2017); *Bailey v. Astrue*, 725 F.Supp.2d 1244, 1256 (E.D. Wash. 2010). The ALJ's rationale for assigning little weight to Dr. Aleman's findings and opinions does not satisfy this standard.

### 1. *"Brief, Conclusory, and Inadequately Supported"*

The ALJ's first reason for assigning little weight to Dr. Aleman's assessment of severe exertional limitations is that his assessment was "brief, conclusory, and inadequately supported." (AR 43.) However, the record shows that Dr. Aleman treated Plaintiff on a regular basis for more than two years. In addition to in-person examinations, Dr. Aleman referred Plaintiff for diagnostic imaging and orthopedic consultations, reviewed the results, and authored reports and authorization requests for additional treatment. The treatment records further reflect that Plaintiff was in chronic pain and that Dr. Aleman's prognosis worsened over time with the delays in authorization for Plaintiff's surgery. Accordingly, the ALJ's finding that Dr. Aleman's opinions were brief, conclusory, and inadequately supported is not supported by substantial evidence in the record.

### 2. *Inconsistent With Brain Scan and X-Rays*

The ALJ's second reason for assigning little weight to Dr. Aleman's assessment of severe exertional limitations is the ALJ's determination that Dr. Aleman's opinions were inconsistent with the negative scan of Plaintiff's head and contradicted by the normal findings from x-ray scans of Plaintiff's lumbar and cervical spine. These are the same studies that the ALJ cited in connection with her rejection of Dr. Hafezi's opinions – namely, a medical record that concerns an individual other than Plaintiff (AR 43 (citing AR 1570), a July 8, 2009 negative CT scan of Plaintiff's head (AR 43 (citing AR 416)), and Dr. Haronian's September 10, 2010 discussion of Plaintiff's x-rays (AR 43 (citing 1592)). Obviously, another patient's treatment records is not a "germane" reason for discounting Dr.

Aleman's opinions. It is also unclear how the July 8, 2009 negative CT scan of Plaintiff's head conflicts with Dr. Aleman's reports and, therefore, the ALJ's characterization of the two as inconsistent is not supported by substantial evidence. (*See generally* AR 43.) Finally, although Dr. Haronian suggested in the September 10, 2010 report cited by the ALJ that the x-rays of Plaintiff's back indicated no serious bone abnormalities, Dr. Haronian did not have the opportunity to review, much less discuss, Plaintiff's 2009 and 2010 MRIs (*see* AR 1593 (stating that he was unable to review any of Plaintiff's diagnostic studies)) and his physical examination of Plaintiff, which revealed spasm, tenderness, and guarding in the paravertebral muscles of the cervical and lumbar spine along with decreased range of motion, is at least generally consistent with Dr. Aleman's observations (AR 1593). Accordingly, the ALJ's determination that these x-rays were inconsistent with Dr. Aleman's opinions is also not supported by substantial evidence.

### 3. Inconsistent With Plaintiff's Activities of Daily Living

The ALJ's third and final reason for assigning little weight to Dr. Aleman's assessment of severe exertional limitations is the ALJ's determination that the limitations were inconsistent with Plaintiff's description of her ability to perform several activities of daily living. (AR 43.) In particular, the ALJ noted that Plaintiff had: reported to the psychiatric consultative examiner that she got along well with others, shopped, cooked, cleaned, paid bills, and performed self-care tasks (AR 39 (citing AR 835)); and testified at the hearing that she was able to read the Bible, drive short distances, watch television, attend church, go out to eat, and prepare simple meals with some difficulties. (AR 39.)

At issue is Plaintiff's ability to perform the following activities. Plaintiff testified that she drives no more than two hours a week – just long enough to pick up her kids from school, which was two to three minutes from her house. (AR 56.) She testified that she has no difficulty preparing "simple meals, fixing sandwiches, cereal, microwaving food." (AR

64.)  She testified that, "with a lot of difficulty," she washes dishes and cleans the table but is unable to do any mopping, sweeping, or vacuuming.  (AR 65.)  She testified that she goes to the grocery store "once a week with the help of [her] family."  (AR 65.)  She testified that she watches television – "sometimes when I am lying down, I just turn it on."  (AR 66.)  She reads the Bible.  (AR 66.)  "Once in a while" she goes out to a restaurant.  (AR 67.)  She attends church "sometimes if [her] pain allows."  (AR 67.)  She testified she goes to church maybe once a month, the service usually lasts an hour, and she has difficulty with both the sitting and the standing components of the service.  (AR 67.)

Plaintiff's descriptions of these activities of daily living do not provide substantial evidence for the ALJ's determination that they are inconsistent with Dr. Aleman's findings and opinions.  Dr. Aleman opined that Plaintiff could sit for no more than 10 minutes at a time or 30 minutes in an eight-hour workday.  (AR 840.)  This is consistent with Plaintiff's statements that she drives for no more than two to three minutes at a time, watches TV lying down, and has difficulty with one-hour church services.  Similarly, Dr. Aleman's opinion that Plaintiff could stand for no more than 10 minutes at a time or 30 minutes in an eight-hour workday (AR 840) is consistent with Plaintiff's testimony that she can prepare simple meals and wash dishes but is unable to mop, sweep, or vacuum and has difficulty with one-hour church services.  Finally, Dr. Aleman's opinion that Plaintiff is limited to lifting and carrying up to 10 pounds occasionally and 20 pounds rarely (AR 840) is consistent with both Plaintiff's description of her ability to cook and clean and her testimony that she can go shopping once a week with assistance from family.  Dr. Aleman also assessed no limitations on Plaintiff's ability to make simple calculations or perform fine manipulation, which are presumably the skills required to pay bills.  (AR 840.)  In sum, the ALJ's determination that Plaintiff's activities of daily living, both as described to the psychiatric consultative examiner and in Plaintiff's testimony at the administrative hearing, were inconsistent with Dr. Aleman's assessments is not supported by substantial evidence in the record.

Accordingly, the ALJ's third reason for assigning little weight to Dr. Aleman's findings and opinions also fails.

For these reasons, the matter must be remanded for reconsideration of Dr. Aleman's assessments. However, as with Dr. Hafezi's opinions, the Court's determination that the ALJ erred is not a finding that the ALJ should necessarily credit Dr. Aleman's opinions and conclusions on remand, only that the ALJ needs to evaluate the record more closely and, if she elects to again discount Dr. Aleman's opinions and conclusions, she must articulate germane reasons supported by substantial evidence in the record for doing so.

## VI.   ALJ's Evaluation Of Dr. Kasimian's Opinion

### A. Dr. Kasimian's Records

On August 17, 2009, Dr. Aleman requested authorization to refer Plaintiff to Dr. Stepan Kasimian, an orthopedic surgeon, for a surgical consultation due to the findings of the July 7, 2009 MRI. (AR 1789.) On September 8, 2009, Dr. Kasimian completed an initial spine evaluation in which he observed the following: Plaintiff had pain traveling down her right arm to her thumb and index finger; Plaintiff had a slightly wide based gait and had "difficulty with tandem gait, turning around swiftly;" Plaintiff had a limited range of motion in her cervical spine; spurling sign was positive with right arm symptoms; lumbar spine had spasm in the lumbosacral region; Hoffman testing was positive on the right; Faber testing was negative; x-rays of the cervical spine showed mild spondylosis with loss of lordosis; and x-rays of the lumbar spine showed retrolisthesis at L4-L5 of 3.5 mm and at L5-S1 of 3.5 mm and there was instability of flexion and extension. (AR 740.) Dr. Kasimian stated that his impression was: "cervical spondylitic myelopathy; herniated nucleus pulposus at C5-6, herniated nucleus pulposus at L4-5 and L5-S1, low back pain, and L5 and S1 radiculitis and intractable pain." (AR 740.) Dr. Kasimian recommended decompression

and fusion for the lumbar spine L4-5 and L5-S1 and anterior cervical discectomy and fusion at C5-6 with spinal cord decompression. (AR 740.) On November 3, 2009, Dr. Aleman stated that he had reviewed Dr. Kasimian's September 8, 2009 orthopedic consultation report and agreed with his recommendation for anterior cervical discectomy and fusion at C5-6 with spinal cord decompression and L4-5 and L5-S1 decompression and fusion due to spondylosis, intractable posterior neck and low back pain as well as intractable leg pain and failure of conservative treatment. (AR 1794.)

### B. ALJ's Findings And Analysis

The ALJ did not address, mention, or cite Dr. Kasimian's report. (*See generally* AR 40-45.) Although Dr. Kasimian is an examining, not a treating, physician, the ALJ was nevertheless required to articulate specific and legitimate reasons supported by substantial evidence for discounting his opinion. *See Trevizo*, 871 F.3d at 675. It was, therefore, legal error for the ALJ to simply ignore his report. *See Garrison*, 759 F.3d at 1012 (ALJ must articulate a "substantive basis" for rejecting a medical opinion or crediting one medical opinion over another); *see also Marsh*, 792 F.3d at 1172-73 ("an ALJ cannot in its decision totally ignore a treating doctor and his or her notes, without even mentioning them"). Although Dr. Kasimian did not express an opinion regarding Plaintiff's functional limitations, some of his objective findings are relevant to the ALJ's determination regarding Listings 1.02 and 1.04. Accordingly, on remand, the ALJ shall consider Dr. Kasimian's report when determining whether Plaintiff's condition meets or equals any of the listed impairments under Social Security regulations and shall not discount any of Dr. Kasimian's findings without articulating specific and legitimate reasons supported by substantial evidence for doing so.

As with Dr. Hafezi and Dr. Aleman's opinions, the Court's determination that the ALJ erred is not a finding that the ALJ should necessarily credit Dr. Kasimian's findings on

remand, only that the ALJ may not overlook them and must articulate a substantive basis for discounting them. The ALJ may benefit on remand from the assistance of a medical expert to summarize and reconcile the thousands of pages of medical records, which reflect years of treatment and medical consultations and contain findings and opinions from multiple treating and examining sources.

## VII.    Remand For Further Proceedings Is Warranted.

In light of the ALJ's errors, the matter must be remanded. The decision whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion. *Harman v. Apfel*, 211 F.3d 1172, 1175-78 (9th Cir. 2000). Under the credit-as-true rule, a district court may remand for an award of benefits when the following three conditions are satisfied: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020. The third of these conditions "incorporates . . . a distinct requirement of the credit-as-true rule, namely that there are no outstanding issues that must be resolved before a determination of disability can be made." *Id.* at 1020, n.26; *see also Leon v. Berryhill*, 874 F.3d 1130, 1133 (9th Cir. 2017) (court must determine whether there are outstanding issues that must be resolved before a disability determination can be made and whether further proceedings would be useful). However, even if those three requirements are met, the Court retains "flexibility" in determining the appropriate remedy and may remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014) (quoting *Garrison*, 759 F.3d at 1021).

Given the length and complexity of the medical record, further administrative proceedings, and, potentially, the testimony of a medical expert, would be useful. Accordingly, this case is not the "rare exception" in which the credit as true rule should be applied and the matter remanded for the award of benefits. *See Leon*, 874 F.3d at 1133. Therefore, the Court remands for further consideration and, if appropriate, development of the record.

## CONCLUSION

For the reasons stated above, IT IS ORDERED that the decision of the Commissioner is REVERSED, and this case is REMANDED for further proceedings consistent with this Memorandum Opinion and Order.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for plaintiff and for defendant.

LET JUDGMENT BE ENTERED ACCORDINGLY

DATED: December 21, 2017

_____
KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE